IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MUOI T. HUYNH,

                     Plaintiff,                            CV-06-1389-ST

      v.                                            OPINION

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,

                     Defendant.          

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Muoi T. Huynh ("Huynh"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 28 USC §§ 401-34. This court has jurisdiction

under 42 USC §§ 405(g) and 421(d). All parties have consented to allow a Magistrate Judge to

enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

For the reasons that follow, the Commissioner's decision is reversed and the case remanded for a

determination of benefits pursuant to Sentence Four of 42 USC § 405(g).

## BACKGROUND

Huynh was born in 1947 in South Vietnam.  Growing up in a fishing village, she received

the equivalent of a fifth-grade education before she quit school to stay home and cook for her

family.  Tr. 238.  During the Vietnam War, her village was bombed and she was shot by the Viet

Cong.  Tr. 223, 252.   In 1978, Huynh fled Vietnam with her five children (while pregnant with

her sixth) by boat without her husband.  Tr. 239.  The boat was caught in a storm and drifted at

sea for two weeks.  Tr. 238-39.  After running out of food and water, being rebuffed at

Singapore, and being robbed by pirates in Malaysia, Huynh and her children escaped and stayed

in a refugee camp for six months before being granted permission to come to the United States.

Tr. 239.

Upon arrival in the United States, Huynh received a short period of public assistance

before she began working.  *Id*.  She worked for several years in a canning factory and then for a

frozen food company.  She held several jobs in the Portland area including her most recent job as

an unskilled laborer for a packaging company where she was employed for over 10 years before

being laid off in February 2001.  Tr. 80, 114-18, 239.

In September 2001,[1] Huynh filed an application for both DBI and Supplemental Security

Income ("SSI") due to Post Traumatic Stress Disorder ("PTSD"), major depression, suicidal

thoughts, headaches, delusions, dizziness, nightmares, arthritis, sleep apnea, loss of appetite, and

back ache.  Tr. 23, 70-72, 79.  A determination dated March 22, 2002, found her disabled

---

[1] Although the ALJ states that she initially applied for benefits on August, 31, 2001, the date of her initial application is September 25, 2001.  Tr. 70-72, 78-87.

beginning February 2, 2001, by meeting § 12.04 of 20 CFR 404, Subpt P, App 1 ("Listing of

Impairments"). Tr. 23, 203, 243-51. On January 28, 2003, her case was reopened based on a

finding of "fraud or similar fault" and her disability determination was revised to a denial.

Tr. 39-42.

Huynh withdrew her SSI application (Tr. 217), but timely filed for reconsideration for

DIB and appeared before a Department of Disability Services ("DDS") hearings officer on

November 24, 2003. Tr. 43-52. The hearing officer disregarded the opinion of Huynh's treating

physician based upon a finding of "fraud or similar fault" in accordance with Social Security

Ruling ("SSR") 00-02p, 2000 WL 253695 (Feb 25, 2000). Tr. 48. After noting numerous

instances where Huynh presented conflicting information and represented herself to be more

disabled then she actually was (Tr. 48-49, 50), the hearings officer found that Huynh did not

have a severe impairment as defined by the Act and denied her claim on reconsideration. Tr. 51.

Huynh requested a hearing before an ALJ which was held on October 14, 2005. Tr. 20-

34, 406-447. The ALJ did not entirely disregard the opinion of Huynh's treating physician and

found that Huynh did suffer from a number of severe impairments. However, the ALJ concluded

that Huynh was not disabled within the meaning of the Act. Tr. 23-33. The Appeals Council

denied Huynh's request for review, making the ALJ's decision the Commissioner's final

decision. Tr. 4-8, 33-34; 20 CFR § 404.981.

## DISABILITY ANALYSIS

To establish a disability under the Act, a claimant must show that she suffers from a

"medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 USC § 423(a)(1)(A).  This impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 USC § 423(d)(2)(A).

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act.  20 CFR § 404.1520; *Bowen v. Yuckert*, 482 US 137, 140-42 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, then the claimant is not disabled.  20 CFR § 404.1520(4)(I).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month duration requirement.  20 CFR §§ 404.1509; 404.1520(4)(ii).  If the claimant does not have such a severe impairment, then she is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals a "listed" impairment in the regulations.  20 CFR § 404.1520(a)(4)(iii).  If it does, then the claimant is disabled.

If the analysis proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by his  impairments.  20 CFR § 404.1520(e); SSR 96-8p, 1996 WL 374184 (July 2, 1996).  The ALJ uses this information to

determine if the claimant can perform past relevant work at step four.  20 CFR

§ 404.1520(a)(4)(iv).

If the claimant cannot perform past relevant work, then at step five the ALJ must

determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at

142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 404.1520(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at

1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs

exist in the national economy for the claimant's RFC.  *Id.*  If the Commissioner meets this

burden, then the claimant is not disabled.  20 CFR § 404.1566.

## THE ALJ'S FINDINGS

At step one, the ALJ found that Huynh had not engaged in substantial gainful activity

since the alleged onset of her disability.  At steps two and three, she found that Huynh suffered

from the severe impairments of dysthymia, tension headaches and osteoporosis in her lumbar

spine, but that none of these impairments met or medically equaled any of the listed

impairments.  The ALJ further found that Huynh's allegations concerning her limitations were

not entirely credible and that Huynh could lift 20 to 40 pounds occasionally, has no limits

regarding standing, walking, or sitting, and could perform simple tasks not involving extensive

social interaction. Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ

concluded at step four that Huynh could return to her past relevant work as a general products

assembler or small products assembler and, therefore, was not disabled.

While acknowledging that Huynh's initial determination was reopened and revised to a

denial based upon a finding of "fraud or similar fault," the ALJ never made an affirmative

finding of "fraud or similar fault," but instead conducted a normal disability analysis.  This is

significant because in addition to permitting the opening and revision of an initial determination, a

finding of "fraud or similar fault" allows the ALJ to disregard any evidence which was provided

through the fraud or similar fault.  42 USC § 405(u)(1)(B).  The ALJ ultimately chose to

disregard the opinions of Huynh's treating physician and other medical and non-medical sources

on other grounds.  By not discussing the evidence of "fraud or similar fault" in detail, it is

difficult to tell the extent to which a finding of "fraud or similar fault" colored the ALJ's

interpretation of the evidence.

## CLAIMANT'S ARGUMENTS

Huynh asserts that the ALJ's findings are not supported by the substantial evidence in the

record and are beset with multiple legal errors.  Huynh challenges the ALJ's findings at steps

three and four.  She asserts that the ALJ erred in failing to show, pursuant to 20 CFR § 404.1594,

that her condition improved after her initial disability determination.  She also contends that her

initial determination of disability was reversed not because of any weakness in her case, but

because of an ongoing investigation into the conduct of her treating psychiatrist, Paul K. Leung,

M.D.

Huynh also incorporates by reference the arguments she made to the Appeals Council.

Tr. 381-88.  There Huynh asserted that the ALJ failed to consider all of her diagnosed severe

impairments, including PTSD and chronic major depression, take into account the combined

impact of her mental and physical impairments, and recontact treating and examining sources to

obtain clarifications of ambiguities in the record.  She also claims that the ALJ improperly

rejected the opinion of her treating physicians, assessed her RFC as able to perform medium

exertional work, found her less than fully credible, rejected lay witness opinions and found that her activities of daily living indicate an ability to work.

Huynh asks this court to reverse the decision of the Commissioner and remand the case for a determination of benefits pursuant to Sentence Four of 42 USC § 405(g). Alternatively, she requests that the court issue a Sentence Six remand and order a completion of the record by having the Commissioner produce the evidence concerning Dr. Leung which Huynh believes motivated the reopening of her case and the ultimate denial of her claim.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Magallanes v. Bowen*, 881 F2d 747, 750 (9th Cir 1989); *see also Batson*, 359 F3d at 1193.

## DISCUSSION

I.    **Reopening a Disability Determination**

    A.    **Legal Standards**

After finding that a claimant is disabled, the Commissioner may change that determination only under specific circumstances.  First, the Act directs the Commissioner to periodically reevaluate the status of a claimant's disability.  42 USC § 421(i); 20 CFR §§ 404.1589-94.  To do so, the Commissioner ordinarily employs a modified version of the five-step disability analysis which is designed to evaluate whether there has been a medical improvement in a claimant's impairments which permits the claimant to engage in substantial gainful activity.  20 CFR § 404.1591(a).  If the claimant is able to engage in substantial gainful activity, then the Commissioner may find that the claimant is no longer disabled.

Absent medical improvement, the Commissioner must determine whether a number of exceptions to this requirement apply.  20 CFR § 404.1594(a).  Two groups of exceptions are located at 20 CFR §§ 404.1594(d) & (e).  Relevant to this case, the Commissioner may determine that a claimant is no longer disabled, without finding medical improvement, if "any prior favorable determination or decision was obtained by fraud."  20 CFR § 404.1594(e)(1).  However, "[i]n determining whether a prior favorable determination or decision was fraudulently obtained, [the Commissioner] will take into account any physical, mental, educational, or linguistic limitations."  *Id*.  Also "[the Commissioner] may reopen [a claim] under the rules in § 404.988."  *Id*.

Under 20 CFR § 404.988(a), the Commissioner may reopen a case "for any reason" within 12 months of the date the claimant received notice of the initial determination.  Additionally, under 20 CFR § 404.988(b), the Commissioner may reopen a determination "for good cause" within four years of the date of the notice of the initial determination.  Finally, 20 CFR § 404.988(c)(1) permits the Commissioner to reopen a determination "at any time" under a

number of circumstances, including when a determination or decision "was obtained by fraud or similar fault."  When the Commissioner reopens and reverses a case pursuant to 20 CFR § 404.988, the claimant may be liable for all benefits erroneously or wrongfully received back to the date of the initial determination.  42 USC § 404(a); 20 CFR § 404.501-27.

**B.    <u>Analysis</u>**

Huynh contends that the Commissioner erred in failing to follow the medical improvement analysis of 20 CFR § 404.1591 after reopening her claim.  The Commissioner responds that the exception of 20 CFR § 404.1591(e)(1) applies because the ALJ made a finding of "fraud or similar fault."  Both arguments are wrong.

An ALJ has authority to review all of the issues brought out in the initial, revised or reconsidered determination that were not decided entirely in a claimant's favor.  20 CFR § 404.946.  Therefore, the ALJ could have evaluated the evidence and concluded that substantial evidence supported a finding of "fraud or similar fault."  The ALJ did not.  Rather, it appears that any effect of inconsistencies or weaknesses in the evidence was factored into the ALJ's analysis of Huynh's credibility or the weight given to opinion evidence.  At no point did the ALJ make a finding of "fraud or similar fault" or disregard evidence on this ground.

Nevertheless, the lack of finding "fraud or similar fault" by the ALJ does not support Huynh's argument.  Under 20 CFR § 404.988(a), the Commissioner may reopen a disability determination "for any reason" within 12 months after the claimant receives notice of the initial determination.  Huynh's initial disability determination was made on March 22, 2002, and the case was reopened less than 12 months later on January 28, 2003.  Huynh's claim was  reopened apparently as part of an investigation into the conduct of her treating psychiatrist, Dr. Leung, and

in order to determine the presence of "fraud or similar fault." Tr. 218. This qualifies as "any

reason." Because Huynh's claim was properly reopened pursuant to 20 CFR § 404.988(a), the

Commissioner was not required to conduct a medical improvement analysis under 20 CFR

§ 404.1591.

**II.**    **Listing of Impairments**

**A.**    **Standards**

Huynh contends that the ALJ erred by failing to find her condition equivalent to one of

the presumptively disabling mental disorders in the Listing of Impairments. The Listing of

Impairments "describes for each of the major body systems, impairments which are considered

severe enough to prevent a person from doing any gainful activity." 20 CFR § 404.1525. A

claimant will be found disabled if his or her impairment meets or equals a listed impairment. 20

CFR § 404.1520(d); *Lester v. Chater*, 81 F3d 821, 828-29 (9th Cir 1995).

The Listing of Impairments dictates specific medical findings and characteristics which

are required in establishing a diagnosis or confirming the existence of a listed impairment. 20

CFR § 404.1525(c). Simply obtaining a diagnosis of a listed impairment is not sufficient. The

claimant must show that "he or she meets each characteristic of a listed impairment relevant to

his or her claim." *Tacket*, 180 F3d at 1099; 20 CFR § 404.1525(d); *see also*, SSR 86-8, 1986

WL 68636 (1986). Alternatively, if a claimant's condition does not *meet* the requirements of a

listed impairment, she can show that her condition nonetheless *equals* a listed impairment by

showing "symptoms, signs and laboratory findings 'at least equal in severity and duration' to the

characteristics of a relevant listed impairment," or to the "listed impairment 'most like' the

claimant's impairment." *Id*, quoting 20 CFR § 404.1526. If a claimant suffers from multiple

impairments, no one of which individually meets or equals a listed impairment, the

Commissioner must evaluate the symptoms, signs and laboratory findings of all impairments to

determine whether the combination of impairments is medically equal to a listed impairment.  20

CFR § 404.1526.

For mental disorders the Commissioner must first evaluate the pertinent symptoms, signs

and laboratory findings to determine whether a claimant has a medically determinable mental

impairment that satisfies the diagnostic criteria (paragraph A) of the listing.  20 CFR

§ 404.1520a(b)(1); Listing of Impairments, §12.00A.  Next the Commissioner evaluates the

degree of functional limitation resulting from the mental impairments by utilizing the criteria in

either paragraph B or C of the listing.  20 CFR § 404.1520a(b)(2).  The B criteria include four

categories:  (1) restrictions of activities of daily living; (2) difficulties in maintaining social

functioning; (3) difficulties in maintaining concentration, persistence or pace; and (4) extended

periods of decompensation.  The required level of severity is shown if the claimant establishes

marked limitation in at least two of the four categories; marked impairment in the fourth

category is demonstrated by repeated episodes of decompensation.  20 CFR § 416.920a(c);

Listing of Impairments, § 12.00C.  If the paragraph B criteria are not satisfied, the Commissioner

next evaluates whether the claimant meets the paragraph C criteria.  Listing of Impairments,

§12.00A.

A determination whether a claimant's condition meets or equals a listed impairment

"must be based on medical evidence demonstrated by medically acceptable clinical and

laboratory diagnostic techniques;" a claimant's testimony alone is insufficient.  SSR 86-8, *4; 20

CFR §§ 404.1508, .1526-27.  The documented medical judgment of a DDS physician meets this

requirement.  *Id*.  Although medical opinions are necessary to establish the presence of a listed

impairment, the opinion of a physician is not controlling on this issue as "the final responsibility

of deciding this issue is reserved to the Commissioner."  20 CFR § 404.1527(e)(2); *see also*, SSR

96-5p, 1996 WL 374183 (July 2, 1996).

     **B.**    <u>**Agency Findings**</u>

On March 22, 2003, Dick Wimmers, Ph.D., a DDS consulting psychologist, completed a

Psychiatric Review Technique Form ("PRTF") indicating that Huynh met Listing 12.04 for

Affective Disorders.  Tr. 243-51.  Based upon a review of Huynh's medical records, he found

that Hunyh satisfied paragraph A criteria and had marked limitation in the first three of the four

B criteria categories.  Dr. Wimmers also found that Huynh suffered from PTSD, but that it did

not precisely satisfy the diagnostic criteria of Listing 12.06 for Anxiety-Related Disorders.

However, he included its effects in his analysis of paragraph B criteria of Listing 12.04.  Tr. 249.

Based upon this report, Huynh's application for DIB was granted.  Tr. 35.

In January 2003, following an investigation for possible fraud, DDS provided a second

PRTF authored by psychologist Peter Lebray, Ph.D.  Tr. 258-65.  Based upon his analysis of the

record, including the report of the fraud investigation and the opinion of DDS consulting

examiner, Joe Wood, Psy.D. (Tr. 252-56), Dr. LeBray found that Huynh suffered no severe

impairments.  While noting the presence, by history, of PTSD, he found that it did not precisely

satisfy the diagnostic criteria for Listing 12.06 and that Huynh had only mild limitations in the

first three paragraph B criteria with no episodes of decompensation.  In his narrative, Dr. LeBray

wrote: "If an established mental condition exists, it is rule out PTSD by history.  This [claimant]

has been in the USA many years, and earned some $2k/mo in 2000.  There may be a cultural role

as well insofar as living with children and stay at home (grand)mom role/function, but this is not a psychiatric disorder."  Tr. 202.  Based on this report, Huynh's application was revised to a denial.  Tr. 36.

After Huynh requested reconsideration, DDS provided a third PRTF in March 2003 authored by psychologist Frank Lahman, Ph.D., who found that the evidence did not establish the presence of a medically determinable impairment.  Tr. 266-67.

This last finding was confirmed by a DDS hearing officer at a hearing held on November 25, 2003.  Tr. 46-52.  The hearing officer found that Huynh had at "numerous times" provided evidence "she knew was false or incomplete."  Tr. 50.  As a result, the hearing officer disregarded the findings of Huynh's treating psychiatrist entirely and relied on the opinion of examining psychologist, Dr. Wood, and the latter two of the three DDS medical consultants who filled out a PRTF.

### C.    ALJ's Findings

Notwithstanding the findings of the DDS consultants and hearing officer, the ALJ found that Huynh suffered from several severe impairments, including the mental impairment of dysthymia.  Because this impairment met the diagnostic criteria of Listing 12.04, the ALJ evaluated the degree of functional limitations imposed by the impairment under the paragraph B and C criteria.

The ALJ found that an evaluation of the impairments under these criteria did not reveal functional limitations which manifested at the degree required to meet either the paragraph B or

C criteria.  According to the ALJ, "[n]o treating or examining source has mentioned findings

equivalent in severity to the criteria of any listed impairment."  Tr. 29.

    **D.**    **Analysis**

        **1.**    **Severe Impairments**

Huynh asserts that the ALJ made multiple errors at this step.  First, Huynh argues that the

ALJ failed to take into account all of her "severe" impairments, including her diagnoses for

PTSD and major depression.  An impairment is "severe" if it significantly limits a claimant's

physical or mental ability to do basic work activities.  20 CFR § 404.1521(a).  The

Commissioner will find an impairment "not severe" if "the medical evidence establishes only a

slight abnormality or a combination of slight abnormalities which would have no more than a

minimal effect on an individual's ability to work."  SSR 85-28, 1985 WL 56856 (Nov. 30, 1984).


Although the Commissioner found that Huynh suffered from several severe impairments,

PTSD and major depression were not among them.  Rather, the ALJ found that while "[o]ther

symptoms and complaints appear in the medical treatment records periodically . . . there is

nothing to show that they are more than transient and/or cause significant vocational

limitations."  Tr. 28.

Contrary to the ALJ's finding, overwhelming evidence in the record indicates that Huynh

does, in fact, suffer from PTSD and that this condition has much more than a minimal effect on

her ability to work.  Huynh was diagnosed multiple times by her treating psychiatrist, Dr. Leung,

with chronic PTSD, chronic dysthymic disorder, and chronic depression.  Tr. 241, 270-71, 276,

279, 283, 306.  On numerous occasions Huynh reported suffering from PTSD symptoms

including anxiety attacks and nightmares in which she has seen "her children die in many ways and many times."  Tr. 240, 284, 295-98, 305.  Huynh also presented herself on numerous occasions as suffering from symptoms of depression including having a depressed mood, a blunted or sad affect and crying or sobbing.  Tr. 271, 279, 281, 362, 370, 372.  The only other psychologist to examine Huynh, Dr. Wood, could not rule out the presence of PTSD or depression despite the fact that he found her to have limited credibility.  Tr. 255-56.

Regarding PTSD, the ALJ believed that Huynh's symptoms could not have been that severe given that she had worked "at times closer to the traumatic events she has had" with no apparent limitation by PTSD.  Tr. 30.  Contrary to this belief, contemporaneous medical evidence shows that Huynh indeed suffers from the severe impairment of PTSD.

Although the ALJ recognized that Huynh had "symptoms" of PTSD, she did not adequately explain why it was not a "severe" impairment.  Although this error is harmless insofar as the ALJ's step two determination was concerned, it is possible that the ALJ's failure to recognize the significance of Huynh's PTSD affected her finding that Huynh did not meet a listed impairment.

### 2.    Severity of Impairment

Huynh contends that the ALJ erred by finding that "no treating or examining source has mentioned findings equivalent in severity to the criteria of any listed impairment."  On several occasions, Huynh's treating psychiatrist, Dr. Leung, found significant limitations in the first three of the four B criteria for Listing 12.04.  Tr. 240-41, 293.  Furthermore, DDS consultant Dr. Wimmers, although not a treating or examining physician, agreed with Dr. Leung by determining that Huynh met Listing 12.04.  In addition, similar findings and observations were

made by two other health care professionals who had significant contact with Huynh.  Tr. 271-
73, 284-85, 307-09, 362-64.

Huynh's own family members also provided evidence of her significant limitations in
daily activities and social functioning.  Tr. 92-103 (daughter), 140-51 (nephew), 162-73
(daughter).  As discussed more fully below, this evidence is relevant when considering the
severity of a claimant's impairments.  20 CFR § 404.1513(d).  However, the ALJ failed to
consider this evidence when determining the extent of her functional limitations under the B
criteria.

### 3.    Combined Effect of Limitations

Also absent from the ALJ's analysis is an evaluation of the impact Huynh's physical
limitations may have on her functional limitations.  20 CFR § 404.1526(a).  The ALJ's
conclusory determination neglects to mention what, if any, impact Huynh's chronic tension
headaches, which she reports affect her daily, and osteoporosis in her lumbar spine may have on
the functional limitations for Listing 12.04.  This constitutes a legal error.  *See Lester*, 81 F3d at
829-30 ("The Commissioner erred as a matter of law in isolating the effects of [claimant's]
physical impairment from the effects of his mental impairment.  Instead, she should have
considered the combined effect of the claimant's physical and mental impairments in
determining whether the functional criteria listed in paragraph B were satisfied.")

### E.    Conclusion

The ALJ's finding that Huynh does not meet at least Listing 12.04 is not supported by
substantial evidence.  If this were the only issue, it would be appropriate to remand for
consideration of the affects of Huynh's PTSD, the testimony of non-medical sources, and the

impact of her physical impairments on her functional limitations under the B criteria of Listing 12.04.  However, Huynh also challenges the ALJ's step four finding that she is capable of returning to her past relevant work, which is discussed next.

**III.    Evaluation of Evidence of Huynh's RFC**

In determining Huynh's RFC, the ALJ rejected the testimony of Huynh as not entirely credible and assigned very little weight to her treating physician, the other medical professionals that treated her at Oregon Health Sciences University ("OHSU"), and her family.  Instead, the ALJ relied primarily upon the statements of Dr. Wood and the OFC investigation.  For the reasons explained below, the ALJ erred in doing so.

///

///

**A.    Huynh's Credibility**

**1.    Huynh's Complaints**

Huynh's initial Disability Report claimed disability due to PTSD, major depression, suicidal thoughts, headaches, nightmares, arthritis, sleep apnea, and loss of appetite.  Tr. 79.  She reported that her conditions render her unable to think clearly or concentrate and unable to perform daily tasks or normal work.  She further reported that she stopped working because of her constant back pain, delusions, headache, and dizziness.

Huynh filled out two Claimant Pain Questionnaires reporting pain due to arthritis, headache, backache, shoulder ache and knee pain.  Tr. 104-06 (November 18, 2001), 130-32 (August 29, 2002).  She reported being in pain pretty much "all the time" that lasts sometimes all day or returns every two to four hours.  Cleaning, carrying objects, movement, and noise cause

the pain to get worse and nothing makes it better.  She must rest every other hour, can no longer do housework or take walks, and engages in no hobbies.  Although she reported doing her own laundry, later in March 2003 she stated that she can no longer do so.  Tr. 154.

Huynh reported living with a friend, cooking canned food once a day, and going grocery shopping once a week.  Tr. 107.  Otherwise she does very little besides watching television and occasionally going on walks or attending religious services.  Tr. 124, 133-37.  She also reported being paranoid, throwing up a lot, and hearing voices. Tr. 134.

In May 2003, Huynh reported significant fatigue which causes her average day to involve watching television, napping, watching television again, and then going to bed.  Tr. 176.  Her sleep is difficult, alternating periods of sleep with wakefulness.  *Id.*

At the hearing before the ALJ in October 2005, Huynh testified that she forgets "a lot," her head aches "all the time," and pain medication helps only "a little bit."  Tr. 417.  She told the ALJ that she suffers from depression which increased when she was unable to find a job after being laid off.  *Id.*  She has memory problems which began "three years ago."  *Id.*  She also had headaches when she was working which, along with her depression, grew worse after being laid off.  Tr. 421.  She also has trouble sleeping and is anxious that her children would throw her out.  Tr. 422-23, 433.

Huynh testified that she can stand for only two to three hours and needs to lay down when she suffers headaches.  Tr. 420-21.  She could probably lift a carton of milk, but has to use both hands.  Tr. 420.  She can sit for one and a half hours to two hours at a time and three hours in an eight hour day and walk for only 30 minutes in an eight hour day.  Tr. 421.

She is able to dress and groom herself, but only performs the chores of dusting and grocery shopping. Tr. 424-25. She cooks usually only canned food and washes only her own dish. *Id*. She walks a little and attends religious services every one or two months. Tr. 425. She never babysits her grandchildren or anyone else's children. Tr. 427, 429. She no longer takes the bus because she got lost once and her daughter had to come and get her. Tr. 431. Although Huynh would love to work at her old job, she believes she could not due to her memory problems. Tr. 431-33.

### 2.    ALJ's Findings

The ALJ found Huynh's allegations not entirely credible in part because "there [was] no persuasive medical evidence of record supporting findings she is incapable of sustaining work activity." Tr. 30. She noted that the fact that Huynh worked in the past "both helps and hurts her credibility." *Id*.

The ALJ further stated that Huynh described daily activities "which were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id*. She found that Huynh's activities included "some housework, cooking, shopping, going to religious services, going to therapy twice a month, and [traveling] to Vietnam in 2004," adding that Huynh "denied walking to the store and doing laundry although documents indicate she had performed these activities." *Id*. The ALJ also noted that Dr. Wood "found evidence of malingering," as did the investigation by the Office of Inspector General. *Id*.

As a result, the ALJ concluded that she could not rely upon Huynh's subjective testimony and had to base her findings solely on the medical records.

### 3.    Legal Standards

The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen v. Chater*, 80 F3d 1273, 1283 (9th Cir 1996). In doing so, the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 917-18; *Lester*, 81 F3d at 834. General statements are insufficient.

### 4.    Analysis

#### a.    OIG Investigation

Central to both the ALJ's determination and the initial reopening of this case was an investigation conducted by the Office of Inspector General ("OIG"). Tr. 216-24. According to the OIG's report, Huynh's claim was reviewed "in connection with the Paul Leung, M.D. project." Tr. 218. That report notes multiple inconsistencies in Huynh's file.

First, the report states that Huynh gave conflicting accounts about her escape from Vietnam. In one instance she reported that her husband did not come with her because he was jailed on the eve of their escape. At another time she stated that he ran off with another woman and refused to escape with them. Huynh reported an attempt to commit suicide while on the boat that was stopped by another refugee, but on another occasion stated that her son stopped her from committing suicide. She reported seeing people killed by pirates, but another time said the pirates left everyone alone.

Concerning her mental issues, Huynh stated she suffers from memory problems, but on one occasion stated that her only problem is lack of mental stimulation. She alternatively attributed her depression to not seeing her husband for 23 years, yet another time referring to 15 years, and yet another time describing her primary problem as her children's treatment of her.

Concerning her activities of daily living and socialization, Huynh gave conflicting accounts as to the household chores she performed. She reported having no friends, but also said she has lived with a friend, friends sometimes cook for her, and she attends group sessions. She stated she does not cook because she burned the oven and floor, but then said that she waits for her landlord to come home and helps him cook. She reported being laid off, but another time said that the business was closed.

An OIG investigator, along with a Portland Police Officer serving as an interpreter, traveled to Huynh's residence as part of the investigation. Tr. 218-19. Upon arrival they noticed Huynh lying on a sofa with a child approximately two to three years old. After the investigators displayed identification, she reportedly escorted the child "out of sight, without any observed physical limitations." Tr. 218. Upon being questioned, she said that she lived with her daughter and son-in-law and paid them $400 a month rent. She said the couple have two children, one two months old, the other two years old, and that the child observed by the officers was not her grandchild but was dropped off by a friend. She stated that she was depressed because her husband had decided to live with another woman and was currently in Vietnam. Although they had been separated since 1968, they only divorced in 1995. She reported that she has six children whom she sees once or twice a month and has three siblings. She told the officers she no longer drived because she gets lost, has memory problems, no longer cooks, has no friends, has weak knees and falls a lot. She admitted walking to the grocery store and frequently attending church.

The investigators noted that an adult male arrived at the residence whom Huynh identified as her son-in-law.  He left after 20 minutes.  To the officers, it appeared that the Huynh was the only person home.

The officers noted that when the questioning focused on Huynh and her problems, she began crying and explained that she had a difficult life in Vietnam.  She reported that she was shot by the Viet Cong and displayed a scar on her upper left chest.  The interpreter believed that Huynh was exaggerating and "playing for sympathy."  They also noted that Huynh understood some English because on three occasions she answered questions posed by the OIG investigator prior to their translation.

At the hearing, the ALJ asked Huynh questions about the OIG investigation.  Tr. 427-29.  Concerning the allegation that she was alone watching the child, Huynh explained that her son-in-law was upstairs and that the child belonged to her son-in-law's friend who dropped off the child for her son-in-law to watch while the friend visited someone in the hospital.  She stated that the investigators did not understand her.   She denied telling the investigators that she paid $400 a month to live at the residence because at that time she had no money to pay rent.

Although at first blush, these inconsistencies in Huynh's story appear to damage her credibility, at least one DDS reviewing psychologist did not find them troubling.  In the notes attached to his PRTF, Dr. Lahman states that many of the inconsistencies were explainable as possibly being due to cultural differences, including Huynh's embarrassment at her own treatment by her children and unfaithful husband.  Tr. 267.  According to Dr. Lahman, "[t]here are many pieces of  a larger puzzle here that could be viewed as a 9x12.  Whereas, if all the pieces were together, the real puzzle may be 12x14."  *Id*.  Dr. Lahman further noted that "[t]he

inconsistencies could be in the interpretation of the listener rather than in an attempt to conceal

or provide false information."  Dr. Lahman's cogent point is supported by the fact that Huynh

has at times told her own treatment team at OHSU alternate versions of her escape story, which

serves to dispel any notion that she was being intentionally deceptive for purposes of financial

gain.  *Compare*, Tr. 239, 375 (husband in jail) *with* Tr. 307, 378 (husband left her).  Furthermore,

it is not clear that she is always referring to the same instance.  *Compare*, Tr. 308 (people on boat

stopped her from committing suicide) *with* Tr. 254 (son stopped her from committing suicide, no

details about circumstances.)

Many of the alleged inconsistencies are not difficult to resolve.  For instance, Huynh has

repeatedly reported that her depression is due to her missing her husband who left her for another

woman, her treatment by her children, and her inability to get a job.  It makes sense that each of

these could be a contributing factor to her present mental condition.  *See* Tr. 240 (noting all three

as factors in her depression).  As another example, her statements that she no longer cooks, but

also cooks with her landlord, may both be true.  She said that her landlord forbade her from

cooking, except when she was supervised which he did when he returned home in the evenings.

Tr. 241.  In addition, her statements that she was laid off and, alternatively, that the business was

closed, are also not necessarily contradictory.

Language barriers appear to play a key role in the difficulties in resolving some of

Huynh's statements.  During the hearing before the ALJ, several of Huynh's responses revealed

that she did not understand the ALJ's questions as she gave entirely non-responsive answers.

Tr. 429, 431-32.  Huynh further explained that this could have caused some of the confusion

over the situation with the child at her daughter and son-in-law's house.

Overall, the OIG investigation is not a convincing reason for finding that Huynh lacks credibility. Many of the alleged inconsistencies are explainable upon closer examination, and it does not appear that OIG made any attempt to determine the effect of the language and cultural barriers.

**b.    Dr. Wood's Findings**

The ALJ also relied heavily on the findings by Dr. Wood who examined Huynh for DDS on October 9, 2002, seemingly as part of the reopening and reinvestigation of her claim spurred by the "Dr. Leung project." *See Truong v. Barnhart*, Civil No. CV-04-1833-AS, Findings & Recommendation by Judge Donald C. Ashmanskas, dated March 17, 2006 (docket # 24), adopted by Order of Judge Garr M. King dated April 24, 2006 (docket # 26) (describing a very similar case involving Dr. Leung and Dr. Wood). For the most part Dr. Wood's findings are unremarkable. Tr. 253-55. He noted similar observations to those made by Dr. Leung concerning Huynh's appearance, memory, orientation, and performance on a number of examinations. Dr. Wood did not, however, believe these observations supported a clear diagnosis of depression or PTSD. More notably, Dr. Wood also administered the Test of Memory Malingering ("TOMM") which purports to test whether a person is intentionally trying to make her memory appear worse than it is. According to Dr. Wood's evaluation, Huynh's scores implied that she intentionally gave incorrect answers which was "indicative of malingering." Tr. 254.

Based upon Huynh's responses to the TOMM and his mental status examination, Dr. Wood made an Axis I diagnosis of "R/O Malingering, R/O Mood Disorder, R/O PTSD," meaning he could not rule out that any of these conditions was present, made no Axis II

diagnosis, and deferred an Axis III diagnosis.  Tr. 256, 267.  This is different than an affirmative

diagnosis.  It is difficult to understand how Dr. Wood could believe that Huynh intentionally

gave wrong answers to skew her test results, and yet could not make an affirmative diagnosis of

malingering.  In any event, Dr. Wood also could not rule out the presence of PTSD or a mood

disorder, both of which were diagnosed by Huynh's treating psychiatrist, Dr. Leung.  Given that

Dr. Wood's opinion does not controvert the primary impairments claimed by Huynh and that the

TOMM does not purport to address these issues, Dr. Wood's opinion is not a convincing reason

for finding Huynh's credibility compromised.

c.    <u><b>Other Bases</b></u>

The ALJ's statement that Huynh's limitations are not as bad as one would expect given

her condition is puzzling.  The evidence shows that Huynh does little more than watch television

all day, cooks canned food and does her own laundry once a week, no longer drives or rides the

bus, has problems with her memory and nearly constant headaches, cries and throws up often,

has frequent nightmares and difficulty sleeping, and only goes out of the house for an occasional

trip to the store or to go to her mental health support group.  How this translates into an ability to

perform basic work tasks such as understanding, carrying out and remembering simple

instructions is not clear.

Also confusing is the ALJ's reliance on Huynh's ability to work close to the date of her

traumatic experiences and supposed lack of deterioration after being laid off from work.

According to Huynh, she suffered from some of her symptoms while working, but was able to

overcome them by her desire to care for her family.  After being laid off and unable to find a job

and being, in her opinion, dishonored by the treatment of her children, Huynh understandably

began to experience more pronounced symptoms.  This narrative of the progression of her illness

is supported by the findings of her treating psychiatrist, Dr. Leung.  Tr. 240, 306.

### 5.     Testimony of Huynh's Family Members

Two of Huynh's relatives completed forms reporting the various activities that Huynh

performed in a day.  Their testimony bolsters Huynh's credibility as they generally confirm

Huynh's activities and social limitations.  Huynh's daughter, Jennifer Nguyen, reported on

November 18, 2001 (Tr. 93-103) that her mother lived with a friend and that she saw her once a

week.  She reported that her mother had few activities outside of the house and primarily

watched television.  Her mother has poor social conversation, leaves home only once a week to

visit children and go to the grocery store.  Although her mother has friends, she does not get

along with them very well and they do not visit her anymore.  Her only other outside activity

was going to her "[mental] club" once or twice a month.  Jennifer also stated that her mother

bathes once a day, brushes her teeth twice a day, and washes her hair once a week, but

sometimes needs to be reminded do so.  She does her own laundry once a week, but otherwise

does no other chores.  She handles her own money and pays her own bills, though not on time

and must be reminded to do so.  She opines that her mother's depression and argumentativeness

would interfere with her inability to work on a regular basis.

On March 10, 2003, Huynh's nephew, Hemingway Huynh, reported seeing his aunt

monthly and that she was then living with a daughter and son.  Tr. 140-51.  He described his aunt

as withdrawn.  Her conversation is appropriate, but she argues and takes offense easily.  She

leaves home only to go grocery shopping (about once a month) and to her OHSU mental

counseling group.  She rarely visits another person or socializes with others.  She used to have

friends, but now that stays in her room.  She watches television two hours a day and has trouble

sleeping.  She prepares her own food out of cans, and her children help her clean up.   She bathes

every other day, washes her hair once a week and brushes her teeth once a day, but needs to be

reminded to do so.  The only chore she does is laundry.  He also reported that his aunt has

trouble sleeping and on a typical day just stays in her room.

On May 5, 2003, Jennifer continued to report that her mother is very limited in her

activities.  Tr. 162-73.  At that time she was living with her only friend again, visiting with

family once a week, and attending group therapy at OHSU twice a month.  She did not go to the

store often or visit other friends.  She had problems relating to people and talked about stories no

one understands.  Other than group therapy, her only other activity was watching television

several hours a day and doing her own laundry.  As before, Jennifer reported that Huynh has

memory problems, has poor hygiene, does not cook, and has difficulty sleeping.  Her typical day

is to  "watch T.V., eat, nap, watch T.V., sleep."  Tr. 172.

In general, the testimony of Huynh's family members conforms very closely to Huynh's

own testimony.  The ALJ considered these statements as "somewhat credible to the extent that

these persons have accurately reported what they have seen, what has been exhibited to them,

and what they have been told."  Tr. 30.  Nevertheless, she ALJ found that "behavior exhibited or

symptoms reported by a person who is not a doctor or vocational expert are not an adequate

basis to establish disability."  *Id*.  Here the ALJ erred.

The ALJ is correct that evidence from acceptable medical sources is required in order to

establish the presence of a medically determinable impairment.  20 CFR §§ 404.1508, .1512(c).

However, evidence from sources other than acceptable medical sources, including family

members, may be used to show the severity of a claimant's impairments and how it affects a

claimant's ability to work.  20 CFR § 404.1513(d); SSR 06-03p, 2006 WL 2329939 (Aug. 9,

2006).  Thus, "[l]ay testimony as to a claimant's symptoms is competent evidence that an ALJ

must take into account, unless he or she expressly determines to disregard such testimony and

gives reasons germane to each witness for doing so."  *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir

2001); 20 CFR § 416.913(d)(4).

The ALJ failed to use the statements from Huynh's family members for their proper

purpose, namely establishing the extent of her limitations.  When considered in that light, it is

striking how the relatives' descriptions corroborate Huynh's testimony.  Their testimony

demonstrates that Huynh is an individual who is greatly restricted in her performance of daily

activities and social functioning and who is not capable of carrying out such basic work activities

as "understanding, carrying out, and remembering simple instructions, responding appropriately

to supervision, co-workers and usual work situations, or "dealing with changes in a routine work

setting."  20 CFR § 404.1521(b).

        **6.**    **Conclusion**

Supposed inconsistencies in Huynh's testimony, evidence of malingering, and the other

bases relied upon by the ALJ are not convincing.   Moreover, Huynh's testimony is corroborated

by the testimony of her family members.  Therefore, the ALJ failed to provide clear and

convincing reasons for finding that Huynh was not entirely credible.

    **B.**    **Medical Source Statements**

        **1.**    **Dr. Leung's Opinions**

Dr. Leung, a psychiatrist and professor at OHSU, first saw Huynh on May 14, 2001, after she was referred by a patient at the OHSU Intercultural Psychiatric Program ("IPP") where Huynh was attending a bi-monthly social skills training group.  Tr. 305-06.  Huynh's chief complaint was being depressed "for a long time."  Tr. 305.  Huynh recounted her history, including her limited education in Vietnam, the dramatic nature of her escape, and the difficulties she had with her children who "do not respect or honor her."  *Id*.  She reported that she had nightmares and awoke screaming due to her traumatic experiences while living in Vietnam and while escaping to the United States.  She also reported having headaches, crying spells, depression, lack of interest in her appearance, startle reaction, frequent wakening at night, low back pain, and one prior suicide attempt.

Dr. Leung conducted a mental status exam, noting that Hunyh was "very cooperative throughout the interview."  Tr. 306.  Huynh "sobbed" while discussing problems with her children.  *Id*.  He found she had no psychotic thought content, had passive sucidal ideation, was oriented times 3, had "somewhat impaired" memory functions, and only fair concentration.  *Id*.  Dr. Leung diagnosed Huynh with PTSD and major depressive disorder and assigned her a Global Assessment of Functioning ("GAF") score of 52.[2]  To treat her symptoms, he prescribed Trazodone, Paxil and Motrin.  *Id*.

---

[2]  The GAF is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  A GAF score between 41 and 50 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."  *Id.*.

When Dr. Leung next saw Huynh on June 19, 2001, he noted that she had lost her job recently, was on unemployment, suffered an increase in headaches and had recently blacked out and fell.  Tr. 301.  Her affect was sad, and she had a crying spell.  *Id*.

On September 11, 2001, Dr. Leung noted that the "Incident in NY" was causing Huynh to suffer increased PTSD symptoms, including an increased sense of apprehension and depression.  Tr. 298.  Less than three months later on December 4, 2001, Huynh reported lots of nightmares and difficulty falling asleep.  Tr. 296.  Her son was laid off recently which caused her a lot of stress, and she was feeling hopeless and worried.  Dr. Leung also noted that "due to poor memory [Huynh] did not tend to stove [and] almost caught kitchen on fire."  *Id*.

On February 25, 2002, Dr. Leung completed a psychiatric evaluation of Huynh for DDS in connection with Huynh's application for benefits.  Tr. 238-41.  Dr. Leung extensively recounted Huynh's history and discussed her memory problems, including her landlord forbidding her to cook without supervision due to her tendency to burn food, pots and pans on the stove.  She could not remember her address or the telephone number at her place and carried it on a piece of paper in case she got lost.  He noted that Huynh attended a skill training group conducted by her community mental health treatment program, including learning English, but would not be able to remember the words or phrases that she had just learned in class.

Hunyh further complained that she was "depressed all the time," partly due to her inability to find a job and also because her children did not honor her according to the traditions of her old country and did not want her around.  Tr. 240.  She missed her husband whom she had not seen in 15-16 years.  She also had feelings of helplessness and hopelessness because she had

no source of income and her chronic conditions which seemed untreatable despite frequent visits to the doctor.

Hunyh also stated that her "past continues to haunt her." *Id*. She reported intrusive memories of the "horrifying" journey she had on the high seas with her children, as well as the traumatic encounters in Malaysia. *Id*. She reported nightmares several times a week, dreaming about hardships, the sea around her and her family, the faces of those who robbed them, and reported seeing her children die "in many ways and many times." *Id*. As a result she was being hypervigilant and responded to unexpected noises or simulation in a very hyperaroused, exaggerated manner.

According Dr. Leung's mental status exam, Huynh was dressed in a disheveled manner with poorly-kempt hair and hair loss. *Id.* She sobbed throughout the interview, looked much older than her stated age, had psychomotor retardation and maintained eye contact 50 percent of the time. She had a sad affect and depressed mood. She admitted having suicidal ideation but denied any urge or plan. Dr. Leung's cognitive examination showed that she was "oriented only to the place but not day or time." *Id*. Huynh was unable to remember two out of three objects after two minutes and her serial 3s reduction test was "quite abnormal, she was unable to focus on the task at all." *Id*. Her "insight was limited but her judgment was intact." *Id*.

Hunyh recounted limited activities of daily living. Tr. 241. She stayed in her room almost all day, had no friends to visit, walked outside of the house at times around the block, and waited for her landlord to come home and prepare dinner with her. She also occasionally attended group therapy sessions and saw her psychiatrist.

Dr. Leung diagnosed Hunyh with "1. [d]ysthymic disorder, chronic form; 2. PTSD, chronic; 3. Amnestic disorder NOS" and "chronic headaches." *Id*. His summary encapsulates the overall thrust of the medical record in this case:

> This is a 54-year-old woman who actually looked ten years older than her stated age. She came with a history of traumatic encounters more than a decade ago when she and her children were escaping out of her country, Vietnam. In addition, at this time she also described a situation filled with life stressors including financial constraints, breaking family, shortage of social network, as well as a sense of continued deterioration and decompensation of her own personal health. She has symptoms and signs of chronic depression. In addition, she also presented with complaints of symptoms and signs consistent with a PTSD diagnosis stemming from the traumatic experiences she had from the time that she tried to escape from her country. At this time I would encourage her to continue seeking psychiatric treatment with appropriate medication and therapy, which should help to alleviate some of the psychiatric symptoms.

*Id*.

The next day Dr. Leung completed a Mental Status Report for Huynh's application for DIB and SSI. Tr. 292-94. As his most recent objective findings, he reported "[lots] of nightmares - difficulty to fall asleep - A son was laid-off recently causing a lot of stresses - Feeling hopeless, helpless. [*sic*]." Tr. 292. He listed his diagnoses as: "Axis I: Postraumatic stress-disorder, Chronic [;] Major depressive disorder - Axis III: GI problems - Axis IV: High stress - family conflicts - loss of employment." Tr. 293.

Dr. Leung reported Huynh's daily activities as "very isolated but able to manage the necessity of shopping and go[ing] to the clinic." *Id*. Hunyh also managed her own funds and was able to maintain her hygiene. For Huynh's social functioning Dr. Leung reported that while she has cooperated with her support group and psychiatric care, she "isolated herself at home most of the time." *Id*. Dr Leung also noted that Huynh's concentration, persistence and pace

was limited as she had a short attention span, was not able to perform simple tasks, and had poor

concentration and memory.  Tr. 294.  Finally Dr. Leung noted that Hunyh was "not able to

function with her house-hold tasks – due to poor memory" as evidenced by neglecting to tend the

stove which almost caught her kitchen on fire.  *Id.*

Dr. Leung saw Hunyh again on June 4, 2002, and noted her continuing unresolved family

problems and memory impairment.  Tr. 289.

 On September 10, 2002, Hunyh reported to Dr. Leung an episode of nausea and

vomiting for which she went to the emergency room.  Tr. 287.  Hunyh also reported an increase

in her nightmares, worries about her future, and inability to communicate with her children.

Hunyh contined to see Dr. Leung with similar frequency, about four or five times a year,

at least through early 2005.  His chart notes report continuing conflicts with her family,

depression, PTSD and anxieties about the legal process for receiving disability benefits.  Tr. 270.

275, 278-79, 281-82.  At nearly every meeting, Dr. Leung assessed Huynh's GAF score as 48-

50.      Finally, Dr. Leung wrote several letters stating his diagnosis and opinion of Huynh's

disability.  On February 25, 2003, he wrote that Huynh "has chronic [PTSD] and chronic

Depression."  Tr. 312.  On February 3, 2004 he wrote that Huynh:

> is a patient of our clinic for treatment of clinical depression and [PTSD].
> She has been taking medication since March 2001 and has come regularly
> for group and individual therapy.  It is my opinion that she is unable to
> engage in gainful employment and is deemed disabled for the next 12-24
> months.

Tr. 314.

Dr. Leung also handwrote a note on February 15, 2005, that Huynh was a patient with

chronic mental illness unable to engage in gainful employment.  Tr. 313.

### 2.    ALJ's Findings

The ALJ noted that while Dr. Leung's opinions "deserve significant consideration," she did not find them persuasive because "he is not objective, his mental status exam was vague . . ., and he seems to rely largely on the subjective complaints of" Huynh.  Tr. 31.  In addition, she stated that "Huynh's activities of daily living are more extensive then Dr. Leung seems to realize" and that Huynh "has not seen Dr. Leung very often."  *Id*.  The ALJ found the opinion of examining psychologist Dr. Wood "more persuasive and objective."  *Id*.

### 3.    Legal Standards

"The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant."  *Reddick*, 157 F3d at 725, citing *Lester*, 81 F3d at 830.  This is "[b]ecause treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual."  *Smolen*, 80 F3d at 1285 (citations omitted).  Therefore, "[a] treating physician's medical opinion as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not inconsistent with the other substantial evidence in the case record."  *Edlund*, 253 F3d at 1157, citing SSR 96-2p.

If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F3d at 830, quoting *Baxter v. Sullivan*, 923 F2d 1391, 1396 (9th Cir 1991).  "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for doing so."  *Id*, quoting *Murray v. Heckler*, 722 F2d 499, 502 (9th Cir 1983).  This can

be done by "setting out a detailed and thorough summary of the facts and conflicting clinical

evidence, stating his interpretation thereof, and making findings." *Thomas v. Barnhart*, 278 F3d

947, 957 (9th Cir 2002), citing *Magallanes*, 881 F2d at 751.  "The ALJ must do more than offer

his conclusions.  He must set forth his own interpretations and explain why they, rather than the

doctor's, are correct." *Reddick*, 157 F3d at 725, citing *Embrey v. Bowen*, 849 F2d 418, 421-22

(9th Cir 1988).

   However, where a nontreating examining physician relies on independent clinical

findings that differ from the findings of the treating physician, the examining physician's opinion

"must be viewed as substantial evidence." *Magallanes*, 881F2d at 751, quoting *Miller v.

Heckler*, 770 F2d 845, 849 (9th Cir 1985).  As the 9th Circuit recent explained "[i]ndependent

clinical findings can be either (1) diagnoses that differ from those offered by another physician

and that are supported by substantial evidence, or (2) findings based on objective medical tests

that the treating physician has not herself considered." *Orn v. Astrue*, 495 F3d 625, 632 (2007).

Where such substantial evidence exists, the opinion of a treating physician is no longer given

controlling weight. *Id*.

   However, even when not controlling, the ALJ must still give the treating source medical

opinion some measure of deference to be weighed by a number of factors listed in the

regulations including:  (1) length of the treatment relationship; (2) frequency of examination; (3)

nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency;

and (6) specialization.  20 CFR § 416.927(d)(2).  But "when evaluating conflicting medical

opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory and

inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir

2005), citing *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001).  Furthermore, it is the

ALJ's job to resolve the conflicts in ambiguous medical records.

A treating physician's opinion is not controlling on issues reserved to the Commissioner,

such as the ultimate question of disability, or whether a claimant impairments meet or equal on

of the listed impairments.  20 CFR § 404.1527(e); SSR 96-5p.  Even though "the administrative

law judge is not bound by the uncontroverted opinions of the claimant's physicians on the

ultimate issue of disability, . . . he cannot reject them without presenting clear and convincing

reasons for doing so."  *Reddick*, 157 F3d at 725, quoting *Matthews v. Shalala*, 10 F3d 678, 680

(9th Cir 1993).

### 4.    **Analysis**

After reviewing the record, this court concludes that the ALJ erred by not giving

controlling weight to Dr. Leung's opinion.  First, no examining physician affirmatively

contradicted Dr. Leung.  Dr. Wood, the only other examining physician, conducted the same

type of mental status examination as conducted by Dr. Leung and made very similar

observations.  And even though Dr. Wood believed that Huynh was intentionally attempting to

skew the results on the TOMM, he still could not rule out the possibility that Huynh suffered

from PTSD and a mood disorder.  Thus, the ALJ was required to offer specific and legitimate

reasons supported by substantial evidence to reject Dr. Leung's opinion.

The ALJ's first rejected Dr. Leung's opinion because "he was not objective."  Tr. 31.

However, the ALJ fails to point out what evidence supports this assertion.  In one comment, the

ALJ opines that the OHSU staff "function as advocates, not objective treating sources."  Tr. 31.

However, the ALJ pointed to no evidence supporting this lack of objectivity other than the fact

that one of the social workers at OHSU "helped [Huynh] with her SSA and referred her to an attorney." Tr. 27. Dr. Leung also assisted Huynh in her application for disability by offering several hand-written opinions and filling out a Mental Status Report. Given Huynh's very limited English skills, it is not surprising that OHSU provided assistance with completing applications. Furthermore, the ALJ is not permitted to assume that doctors routinely lie in order to assist their patients in obtaining disability benefits. *Lester*, 81 F3d at 832, *but see Crane v. Shalala*, 76 F3d 251, 254 (1996) (ALJ could take fact that social worker helped claimant fill out paper work into account when evaluating opinion). The fact that a physician, in his treatment of a patient, would assist his patient in obtaining benefits to help her deal with her disability is not significant evidence that the physician has abandoned his objectivity. Without more explanation of what evidence demonstrates a lack of objectivity, this reason for rejecting the opinion of Dr. Leung is not legitimate.

The ALJ also rejected Dr. Leung's opinion because "his mental status exam was vague." Tr. 31. The ALJ is free to reject any opinion that is brief, conclusory, and unsupported by adequate clinical findings, or that is based primarily on the subjective complaints of a discredited claimant. In making this assertion, the ALJ refers to Dr. Leung's first appraisal of Huynh on May 14, 2001. Tr. 306. While the record of that exam is brief, Dr. Leung provided additional mental status exams of Huynh that more than compensate for any inadequacies in this first appraisal. Tr. 238-41, 292-94. Plus, to the extent that the ALJ felt that Dr. Leung's opinions were vague, she had a duty to develop the record, including recontacting Huynh's treating physician. 20 CFR § 404.1512(e). This reason for rejecting Dr. Leung's opinion also fails.

Insofar as the ALJ rejected Dr. Leung's opinion because of heavy reliance upon Huynh's subjective complaints, or upon any misapprehensions she felt he had about Huynh's activities of daily living, that reason fails as well as since Huynh's testimony should have been fully credited.

Finally, the ALJ's statement that Dr. Leung did not meet frequently with Huynh is simply not supported by the record.  Over a four year period, Huynh saw Dr. Leung for treatment a minimum of 15 times, or nearly four times a year.   In addition, as a part of the IPP, Dr. Leung was privy to the chart notes and annual mental health assessments conducted by other treatment staff members of the IPP.

Because her bases for rejecting Dr. Leung's opinions all fail, the ALJ erred in assigning more weight to the opinion of Dr. Wood.

### C.    <u>Other Source Statements</u>

In addition to Huynh's statements and testimony, Dr. Leung's opinions, and statements by her family members, Huynh's limitations are set forth extensively by several others who do not qualify as acceptable medical sources.  Although these opinions are not sufficient to establish the presence of a medically determinable impairment, they nevertheless may serve as evidence of the extent of a claimant's limitations and are to be evaluated using factors such as:  (1) the length of the relationship and frequency of contact; (2) consistency with other opinions in the evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; and (5) whether the source has a specialty or area of expertise related to the individual's impairment.  SSR 06-03p; 20 CFR § 404.1513(d).  In some circumstances, the opinion of a medical source who is not an acceptable medical source can outweigh the opinion of an acceptable medical source, including a treating source.  *Id*.

During the course of her treatment by the IPP, Huynh was seen frequently by several mental health professionals:  Jeremy Nguyen, MSW, QMHP ("J. Nguyen"), Thanh Nguyen, QMPH ("T. Nguyen"), and Loan Huynh, MSW, QMPH ("L. Huynh").  J. Nguyen was the first to meet with Huynh on March 19, 2001.  Tr. 307.  He filled out a Mental Health Assessment form which diagnosed both major depression and PTSD, reported Huynh's GAF as 30, and noted her chronic headache, severe financial stress, lack of family support and unemployment. He also noticed some impairment in a number of areas such as insight, judgment, cognitive ability, memory, orientation, mood, affect and others.

Huynh then began attending the IPP skill training group on an approximately bi-monthly basis.  The group was led by T. Nguyen and L. Huynh who consistently noted signs and symptoms consistent with J. Nguyen's initial assessment and Dr. Leung's opinions.  Huynh had a sad affect, chronic headaches, anxiety, depression, nightmares, poor concentration, and pain in her body.

All of the factors listed in SSR 06-02p weigh in favor of crediting the opinions of these mental health professionals.  T. Nguyen and L. Huynh saw Huynh approximately one to four times a month for a time period of at least four years.  T. Nguyen often observed that Huynh complained of poor sleep with nightmares, pain all over her body, headaches, poor mood, anxiety, but yet she had a cooperative attitude during the social skills training group.

T. Nguyen filled out multiple Annual Mental Health Assessments Update forms for Huynh.  Tr. 271-73, 284-85, 362-64.  The assessments are based upon T. Nugyen's observations of Huynh, as well as her reports.  Each of these continues to note the presence of major

depression and PTSD and agree with the observations of the initial assessment by J. Nguyen and the opinions of Dr. Leung.

The ALJ only responded to the statements and opinions of these sources by stating that she had "considered" them, but did not give them "much weight" because they were not acceptable medical sources and were not very "objective." Tr. 31. The ALJ erred in failing to address the extensive and consistent observations and opinions made by these non-accepted medical sources. Given their extensive treating relationship, consistent observations, and the fact that all three were trained to work with the mental health issues of Huynh, the ALJ failed to provide a cogent reason for rejecting their opinions.

### D.    Huynh's Exertional Capacity

Another oddity of the ALJ's RFC finding concerns Huynh's exertional capabilities. At the time of the hearing, Huynh was 58 years old and weighed less than 90 pounds. She testified that she was unable to lift more than a gallon of milk and required the use of two hands to even do that. Huynh's relevant work activity was classified as light exertional work which the regulations define as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 CFR § 404.1567. Huynh further testified to limitations in the amount of time she can walk, sit, and stand.

The only medical opinion in the file concerning her physical capacity was given by her former treating physician, Anthony H. Lee, M.D. Tr. 231. Dr. Lee did not note any limitations on Huynh's ability to sit, stand, walk, lift, or carry. However, he did note that given her small body frame and age, "there must be some degree of limit compared to normal sized people" and diagnosed her with mild arthritis in her hand. Tr. 231-32. Based solely on this medical opinion

given nearly four years before the ALJ's decision, the ALJ found that Huynh retained the

capacity to lift 20 to 40 pounds occasionally and had no limits in her ability to stand, walk or sit.

Tr. 31.

Given the paucity of evidence and ambiguity in Dr. Lee's short medical opinion, the ALJ

had no basis for her RFC determination.  As demonstrated above, Huynh was a credible witness

concerning her physical capacity.  Furthermore, even accepting Dr. Lee's observations, no

evidence supports Huynh's ability to lift over 20 pounds, even occasionally.  Thus, the ALJ's

RFC was not supported by substantial evidence.

### E.    Conclusion

For the reasons discussed above, the RFC assigned to Huynh by the ALJ was in error as

it was not supported by the substantial evidence in the record.

## IV.    Remand

After finding that the ALJ erred, this court has discretion to remand for further

proceedings or for immediate payment of benefits.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th

Cir 2000).  The issue turns on the utility of further proceedings.  A remand for an award of

benefits is appropriate when no useful purpose would be served by further administrative

proceedings or when the record has been fully developed and the evidence is not sufficient to

support the Commissioner's decision.  *Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989).

Thus, improperly rejected evidence should be credited as true and an immediate award of

benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting

such evidence, (2) there are no outstanding issues that must be resolved before a determination

of disability can be made, and (3) it is clear from the record that the ALJ would be required to

find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292. Where it is not clear the ALJ would be required to award benefits were the improperly rejected evidence credited, the court has discretion whether to credit the evidence. *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

The evidence in this case overwhelmingly supports the fact that Huynh is unable to perform basic work activities. At the hearing, Huynh's attorney asked the vocational expert ("VE") whether consistently missing a day and a half of work every month due to symptoms of depression would not be able to maintain SGA in the market for unskilled workers. Tr. 444-47. The VE replied that such absenteeism would preclude Huynh from being able to work. The evidence in this case shows that Huynh's depression, PTSD and frequent severe headaches significantly restrict her activities of daily living and social interaction causing her to stay in her room or watch television except for the occasional trip to the store, to visit family or to go to her group therapy. Furthermore, the evidence shows that, due to her impairments, performing even simple tasks is difficult. Therefore, it would not be possible for Huynh to return to her past relevant work.

Because Huynh is unable to perform her past relevant work, the disability analysis next proceeds to step five where the Commissioner bears the burden of proving that she can perform a significant number of other jobs in the national economy. 20 CFR §§ 416.920(g), 416.960(c)(2).

At the time of her application, Huynh was an individual approaching advanced age. 20 CFR Pt. 404 Subpt. P, App. 2, § 200.00(g). As this regulation provides, "where such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." *Id*. According to

20 CFR § 202.09, based upon Huynh's level of education (unable to communicate in English) and previous work experience (unskilled), she is presumptively disabled even assuming she retains the physical RFC to perform light exertional work.

Because no outstanding issues must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find Huynh disabled if all improperly rejected evidence were credited, this case is remanded for a determination and award of benefits.

DATED this 7th day of February, 2008.

_____
Janice M. Stewart
United States Magistrate Judge